IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA, | Case No. 16-cr-00005-CRB-1 |
| Plaintiff, | |
| v. | **ORDER RE BUCKLEY TESTIMONY** |
| SIMPSON, | |
| Defendant. | |

On May 12, 2016, San Francisco Police Department Officer Nicholas M. Buckley (#528) testified during an evidentiary hearing relating to a motion to suppress. During Buckley's cross-examination, Defendant Brandon Simpson's attorney played a video showing that much of Buckley's testimony had been inaccurate. The government quickly moved to dismiss the case against Simpson. Although concerned by Buckley's false testimony, the Court declined to hold Buckley in criminal contempt, deferring to the government's anticipated perjury investigation. The Court recently learned that any perjury inquiry has concluded without further action. The Court thus invited Buckley to present the Court with any information he desired about his testimony. Buckley submitted a letter arguing that the Court lacks jurisdiction to issue any order regarding his testimony but offering to informally discuss his testimony with the Court in camera.

The Court declines to hold a closed, informal hearing regarding Buckley's testimony. And the Court determines that although it has grounds to do so, the Court will not initiate contempt proceedings based on Buckley's false testimony for the reasons set forth below.

## I.      BACKGROUND

Simpson was charged with being a felon in possession of a firearm after Buckley and another officer detained Simpson in the Tenderloin neighborhood of San Francisco. See Indictment (dkt. 3); Mot. to Suppress (dkt. 12) at 2. Simpson moved to suppress evidence of the firearm, arguing that his detention was illegal because he had not been engaging in any suspicious activity, and indeed had been "merely walking down a public sidewalk" when the officers approached him. Mot. to Suppress at 4. The government offered a different account based on declarations from Buckley and fellow SFPD officer John Fergus. See Opp. (dkt. 13) at 1–5. On May 12, 2016, the Court held an evidentiary hearing to resolve that factual dispute. See Hearing Tr. (dkt. 32).[1]

Buckley was the sole witness at the hearing. See Hearing Tr. at 5. After being sworn in, he testified that he had experience investigating illegal dice games in the Tenderloin, including at the intersection of Eddy and Taylor streets. Id. at 7–8. Dice games in the Tenderloin "usually occur behind the cover of parked cars[.]" Id. at 7.

Buckley testified regarding the evening of December 1, 2015 as follows: Buckley and Fergus were driving down Eddy street near Taylor street in their patrol car when they saw a group that "looked like they were playing dice" because "their attention was focused down at the ground that was in front of them." Id. at 14. Several people "were sitting on milk crates on the sidewalk" behind a row of parked cars. Id. The officers circled the block and stopped near the group. Id. at 20. Buckley exited the car, a lookout told the group that police had arrived, and Simpson, who had been standing and looking down at the sidewalk, "looked directly at the car" and "made eye contact" with Buckley. Id. at 20–21. Simpson then "immediately turned and started walking quickly" away from the group. Id. at 21. Buckley noticed "how fast" Simpson was walking, and that Simpson's arms were not "swinging." Id. Simpson's arms "weren't swaying back and forth. His arms were tight against his side, and . . . the way in which he was walking wasn't a relaxed

---

[1] The hearing transcript cover page erroneously indicates that the hearing took place on May 12, 2012, but the transcript otherwise reflects the correct date. See Hearing Tr. at 1, 3.

walk. It was a very rigid kind of a staccato walk." Id. At the government's request, Buckley mimicked this rigid walk for the Court. Id. at 21–22. Simpson's fast walking made Buckley think that Simpson was trying to "evade" the police, and Simpson's rigid gait indicated that Simpson was "trying to conceal something . . . such as a weapon." Id. Buckley followed Simpson, who looked over his shoulder, made eye contact with Buckley, and "sped up slightly." Id. at 23. Buckley then jogged past Simpson, turned, faced Simpson, and asked Simpson "Hey, what's going on? Can I talk to you for a second?" Id. at 24. Simpson "made a quick, sharp turn to his left" and began walking away. Id. Simpson then "turned again" and reversed direction, "still with the rigid body posture." Id. at 25. Buckley continued to mirror Simpson's movements, walking side-by-side with Simpson from about two feet away. Id. at 26. At this point, Buckley noticed that he could not see Simpson's hands. Id. at 27. "[B]oth of his arms were pressed up against his side, and his hands were up near his waistband . . . and I could not see his hands. They were not sticking out." Id. This concerned Buckley because "the things that will hurt you the fastest and the most are someone's hands."

The Court asked Buckley what Simpson had been wearing to better understand how Simpson's hands were obscured. Id. at 28. Buckley explained that Simpson "had on a large, brown coat . . . but where the sleeves are, I didn't see the defendant's hands . . . they were completely gone from me, because they were around the front, at the bottom of what we call 'the waistline.' They were obscured somewhere beneath either the waistline or . . . within the sleeve of the jacket." Id. at 28–29.

Buckley testified that he ordered Simpson to show his hands, and that Simpson "showed the same mentality of just ignoring me and pretending he couldn't hear me." Id. at 29. Simpson "turned his shoulder away" and "looked side to side." Id. Buckley interpreted this as Simpson looking for "avenues of escape" and as an additional sign that Simpson was concealing something. Id. at 30. Buckley grabbed Simpson's arms and told Simpson to turn around. Id. at 30–31. Simpson's body "tensed up," Buckley "had to physically turn him around," and when Buckley ordered Simpson to put his hands on top

3

of his head, Simpson did not comply.  Id. at 31.  Buckley and other officers thus used force to subdue Simpson.  Id.

On cross-examination, Buckley testified that of the people who had walked away from the apparent dice game in the same direction as Simpson, Simpson had walked "the fastest." Id. at 39.  Buckley reiterated that Simpson had been walking "abnormally" and stated that Buckley "never saw" Simpson's hands during the encounter.  Id. at 40, 45.

Then, Simpson's attorney showed Buckley a video of the encounter.  See id. at 52.  The video contradicted Buckley's testimony in numerous ways.  See Ex. A-1.  It showed that when Buckley exited the patrol car, people began walking away.  But Simpson was not walking quickly—indeed, he was walking slowly and behind other people walking away much more quickly.  Id. at 00:10–00:24.  Further, Simpson's arms were swinging normally, and his hands were visible—in his right hand, he was holding a water bottle.  Id. at 00:20–00:24.  It does not appear that Buckley was ever walking behind Simpson, that Simpson ever turned to look back at Buckley walking behind him, that Buckley jogged in front of Simpson, turned, and faced him, or that Simpson's hands were ever concealed.  Id. at 00:10–00:24.  Instead, Buckley cut off a slowly walking Simpson—and when the two were face to face, Simpson held up his hands.  Id. at 00:23–00:26.

Upon viewing the video, Buckley testified that it was "correct" that others were walking faster than Simpson, but when asked whether Simpson "had his hand extended with a water bottle in it," Buckley replied "I don't see it." Hearing Tr. at 58.  Simpson's attorney replayed the video for Buckley and asked again if he could see the water bottle.  Id. at 59.  "I don't see it, no." Id.

Because it was obvious that Buckley's testimony had been materially false, the Court took a short recess, then remarked: "There are two versions.  One is the testimony.  The other is the video." Id. at 60.  The Court instructed the government to "confer with people in your office . . . and tell me what you want to do." Id.  The Court then took a 2.5 hour recess, during which the government moved to dismiss the charges against Simpson.  Id. at 61–62.

After that longer recess, the Court noted that Buckley's testimony, including during his cross-examination, had appeared "straightforward, convincing, [and] entirely credible" until Simpson's attorney played the video. <u>Id.</u> at 63. Before then, Buckley "didn't appear to hesitate." <u>Id.</u> at 64. But the "video was unequivocal in rebutting everything that the police officer testified to—at least as to all pertinent details." <u>Id.</u> The Court directed the government to "furnish copies" of the hearing transcript to the "Chief of Police of the San Francisco Police Department to take whatever action he thinks is appropriate." <u>Id.</u> at 66. Finally, the Court noted that it was "deeply saddened" by "this turn of events." <u>Id.</u>

The Court deferred taking action (by, for example, holding Buckley in contempt) and assumed that the government would inform the Court regarding the outcome of a perjury investigation. The Court eventually learned that any inquiry had concluded without charges or other punishment via a February 2021 news article.[2]

On March 11, 2021, the Court informed Buckley that the Court was considering issuing an order regarding Buckley's testimony and invited Buckley to submit any relevant information. <u>See</u> First Order Re Testimony (dkt. 35). On May 7, 2021, Buckley's counsel submitted a letter in response. <u>See</u> Buckley Letter (dkt. 39). The letter argues that the Court need not issue an order regarding Buckley's testimony because the Court already opined on the testimony during the hearing, argues that the Court lacks jurisdiction to issue such an order because this criminal case has been closed and Buckley was not a party, and expresses concern that the Court's March 11, 2021 order closely followed a news article indicating that Buckley had not been prosecuted for perjury or punished by the San Francisco Police Department. <u>Id.</u> The letter nonetheless states that Officer Buckley would address his prior testimony "<u>in camera</u> in an informal setting." <u>Id.</u>

## II.    RELEVANT LEGAL PRINCIPLES

Although not expressly granted in Article III of the United States Constitution,

---

[2] <u>See</u> Michael Barba, <u>SF police return officer to patrol despite false testimony</u>, San Francisco Examiner (Feb. 24, 2021, 6:45 PM), https://www.sfexaminer.com/news/sf-police-return-officer-to-patrol-despite-false-testimony/.

"[t]he power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." Ex Parte Robinson, 86 U.S. 505, 510 (1873). Thus, when "the courts of the Untied States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." Id.

That said, Congress may regulate "[t]he manner in which the court's prosecution of contempt is exercised." Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787, 799 (1987). Under the federal criminal contempt statute, a federal court may punish "misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice," or "disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401. Rule 42 of the Federal Rules of Criminal Procedure sets forth procedural requirements in criminal contempt cases. Under Rule 42, "[a]ny person who commits criminal contempt may be punished for that contempt after prosecution on notice." Fed. R. Crim. P. 42(b). A court "may summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies." Id. But if the court waits until after the relevant underlying proceedings have concluded to initiate contempt proceedings, the alleged contemnor "should have reasonable notice of the specific charges and [an] opportunity to be heard in his own behalf." Taylor v. Hayes, 418 U.S. 488, 499 (1974).[3]

False testimony can constitute contempt in certain circumstances. For example,

---

[3] Given the Court's decision not to initiate contempt proceedings, it is unnecessary for the Court to determine whether any express or implied limitations period could bar such proceedings. Contempt proceedings under 18 U.S.C. § 402 must be "instituted . . . within one year from the date of the act complained of." 18 U.S.C. § 3285. But § 402 does not govern contempt "committed in the presence of the court, or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 402. Nor does it appear that 18 U.S.C. § 3282's general limitations period applies to contempt proceedings. Section 3282 provides (with exceptions not relevant here) that non-capital offenses may not "be prosecuted, tried, or punished . . . unless the indictment is found or the information is instituted within five years . . . after such offense shall have been committed." But contempt proceedings do not require any indictment or information. See Fed. R. Crim. P. 42(b).

such testimony may amount to a "willful refusal to obey the order of [a] Court" directing the witness "to provide truthful testimony." United States v. Becknell, 2013 WL 12131878, at *5 (N.D. Okla. Feb. 27, 2013), affirmed 534 Fed. Appx. 704 (10th Cir. 2013). However, "perjury alone does not constitute an 'obstruction' which justifies exertion of the contempt power." In re Michael, 326 U.S. 224, 228 (1945) (quoting Ex Parte Hudgings, 249 U.S. 382, 383 (1919)). Only perjury combined with "the further element of obstruction to the Court in the performance of its duty" is contempt. Id.

Thus, courts must conduct a sensitive analysis to determine when perjury has obstructed proceedings. Obstruction may entail "delaying proceedings, making more work for the judge, inducing error, [or] imposing costs on parties." United States v. Ortlieb, 274 F.3d 871, 876 (5th Cir. 2001) (quoting United States v. Oberhellmann, 946 F.2d 50, 52 (7th Cir. 1991)). "It suffices if the defendant's conduct interrupted the orderly process of the administration of justice by distracting court personnel from, and delaying them in, completing their duties." United States v. Peoples, 698 F.3d 185, 191 (4th Cir. 2012) (citation omitted). Obstruction may occur, for example, when "without the aid of extrinsic evidence the testimony is so plainly inconsistent, so manifestly contradictory, and so conspicuously unbelievable as to make it apparent from the face of the record itself that the witness has . . . given answers which are replies in form only and which, in substance, are as useless as a complete refusal to answer." Collins v. United States, 269 F.2d 745, 750 (9th Cir. 1959) (citation omitted). As Learned Hand explained over a century ago, obstruction occurs when a witness "attempt[s] to prevent any effective examination" through obviously false testimony. United States v. Appel, 211 F. 495, 495–96 (S.D.N.Y. 1913) (Hand, J.).

## III.    DISCUSSION

The Court begins by addressing several aspects of Buckley's letter. First, the Court rejects Buckley's contention that the Court lacks jurisdiction to issue an order regarding Buckley's testimony because there is no ongoing "case or controversy" in this criminal matter. See Buckley Letter. The Court's authority to initiate contempt proceedings arises

from its inherent authority under Article III, see Ex Parte Robinson, 86 U.S. at 510, and that power is not limited to parties in ongoing cases, see 18 U.S.C. § 401; Fed. R. Crim. P. 42(b) (authorizing a court to hold in contempt any person in the Court's "presence or so near thereto as to obstruct the administration of justice"). Second, the Court acknowledges that it invited Buckley to submit information regarding his testimony after a news story revealed that Buckley had not been prosecuted for perjury. See Buckley Letter. The Court expected to be advised regarding the outcome of any perjury investigation. But the Court's decision to invite Buckley to submit information arises from the Court now knowing the outcome—not how the Court came to know the outcome.

The Court nonetheless declines to order Buckley to show cause why he should not be held in contempt. See Fed. R. Crim. P. 42(a)(1).

The Court reaches this decision even though Buckley arguably committed criminal contempt by obstructing the Court in the performance of its duties. Anyone at the evidentiary hearing, or who has reviewed the hearing transcript, would conclude that Buckley provided false testimony. But Buckley's testimony also disrupted the proceedings in several ways. First, it prompted the Court to take two recesses to give not only the Court, but also the parties, the opportunity to grapple with the surreal contradiction between Buckley's testimony and the video. Second, Buckley's testimony refusing to acknowledge the water bottle in Simpson's hand on the video ("I don't see it . . . I don't see it, no"), see Hearing Tr. at 58–59, was "conspicuously unbelievable," Collins, 269 F.2d at 751, and an apparent attempt to prevent "any effective examination," see Appel, 211 F. at 495–96. Indeed, that testimony short-circuited Buckley's cross-examination. See Hearing Tr. at 59. Third, Buckley's testimony did not merely include one or two falsehoods. It was closer to an epic fantasy: "an hour, an hour-and-a-half" of pure fiction, see Hearing Tr. at 62, featuring not only false testimony but also Buckley physically acting out Simpson's supposedly rigid gait for the Court, see id. at 22. The testimony's falsity, moreover, became apparent during the testimony itself. See Collins, 269 F.2d at 750. Although "[a]ll perjured relevant testimony is at war with justice," In re Michael, 326 U.S.

8

at 227, Buckley's prolonged, false, and ultimately non-responsive testimony thwarted an effective hearing and wasted the Court's time.

Buckley has been offered a chance to clarify his version of events, but he has conditioned providing further information on a series of anomalous procedural requests including an informal, private hearing with no effective cross-examination. The Court declines to engage in anything resembling this sort of back-room factfinding. The false testimony was public; Buckley's explanation should be as well. The Court's conclusion that Buckley's testimony was false thus remains unchanged.

But the Court declines to initiate contempt proceedings now. At the hearing, the Court referred this matter for a perjury investigation given the Court's preference to not unilaterally punish an affront to the orderly administration of justice when alternative approaches may accomplish the same purpose. Here, those alternative approaches have resulted in nothing happening. But because five years have elapsed since Buckley's testimony, because the United States Department of Justice has apparently declined to prosecute Buckley, and because the Court remains convinced that a perjury investigation was the most appropriate path, the Court will not take further action.

This does not mean that Buckley's false testimony is without consequences for the justice system in general or Buckley in particular. As the Court remarked at the time, perjured testimony is an affront to not only those devoted to the administration of justice, see Hearing Tr. at 65, but also to anyone with confidence in the justice system, see Giglio v. United States, 405 U.S. 150, 153 (1972) ("[D]eliberate deception of a court . . . by the presentation of known false evidence is incompatible with rudimentary demands of justice.") (internal quotation marks omitted). When that testimony comes from a peace officer, it is particularly damaging to the public's faith in law enforcement and the courts. Further, under Giglio and Brady v. Maryland, 373 U.S. 83 (1963), a criminal defendant's right to due process requires prosecutors to disclose "evidence that could be used to impeach one of the prosecution's witnesses," Milke v. Ryan, 711 F.3d 998, 1003 (9th Cir. 2013). Going forward, if Buckley testifies before any court for the prosecution, the

prosecution will likely be required to furnish the defense with evidence of Buckley's false testimony.

In sum, the justice system relies on honest testimony, particularly from those who have sworn to uphold the law. Serious harms flow from a peace officer's known false testimony, but individual responsibility—in one form or another—is difficult to evade.

## IV. CONCLUSION

The Court anticipates no further proceedings in this case. A copy of this order shall be served on Buckley through his counsel.

**IT IS SO ORDERED.**

Dated: May 18, 2021



CHARLES R. BREYER
United States District Judge